UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LATASHA MADISON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:11CV238 TIA |
| | ) |
| MICHAEL J. ASTRUE, COMMISSIONER | ) |
| OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court under 42 U.S.C. § 1383(c)(3) for judicial review of the denial of Plaintiff's application for Supplemental Security Income benefits under Title XVI of the Social Security Act. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

On January 23, 2007, Plaintiff filed an application for Supplemental Security Income ("SSI"). (Tr. 78-80) Plaintiff alleged disability beginning December 2, 2006 due to Narcolepsy. (Tr. 39, 78) Plaintiff's application was denied on March 28, 2008, after which Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (Tr. 31-32, 39-44) On May 12, 2009, Plaintiff appeared and testified at hearing before an ALJ. (Tr. 16-30) In a decision dated June 16, 2009, the ALJ determined that Plaintiff was not under a disability at any time through the date of the decision. (Tr. 9-15) On January 4, 2011, the Appeals Council denied Plaintiff's Request for Review. (Tr. 1-3) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

On May 12, 2009, Plaintiff appeared at a hearing before an ALJ and was represented by counsel. Upon questioning by her attorney, Plaintiff testified that she was 38 years old and lived with her three daughters, ages 18, 13, and 10, and her mother. She completed the tenth grade and had no technical or vocational training. At the time of the hearing, Plaintiff weighed 150 pounds and measured 5 feet 3 inches. Plaintiff last worked New Year's Eve, 2008, for only one day. Prior to that job, Plaintiff last worked two years before setting up for banquets. She left that job because it was a temporary, seasonal position. (Tr. 18-20)

Plaintiff further testified that she was unable to work due to narcolepsy, which made it difficult to stay awake. Plaintiff stated that she fell asleep 8 to 9 times a day. The times she fell asleep were unpredictable, and she would fall asleep standing up, walking, and sitting, even during a conversation. Plaintiff further testified that she sometimes had prior warning of an episode but that the warning was only about two minutes before. Plaintiff was treated by Dr. Bucelli of Connect Care on Delmar Neurologists. Plaintiff first took Ritalin, which helped until she built up an immunity. She currently took Dexadril because she did not have insurance to cover the costs of the other drug, Provigil. Plaintiff qualified for free health care at Connect Care, but she did not receive Medicaid for prescriptions. Plaintiff testified that she had no income, although she expected to receive child support. Her mother worked and helped with expenses. (Tr. 20-23)

Plaintiff did not have a driver's license, although she had one in the past. She was able to get out and do things such as attend attending her children's events. However, Plaintiff testified that she fell asleep during these events. Plaintiff went to church every Sunday but could not stay awake during the two hour service. She did not cook because she fell asleep. Plaintiff was able to wash

2

dishes and clothes, although she fell asleep while doing laundry. Plaintiff's mother did the grocery shopping. While Plaintiff tried to help her children with homework, but she had problems such as falling asleep while reading. She did not participate in any outdoor activities such as gardening or doing the lawn. (Tr. 23-25)

Plaintiff also testified about her sleep patterns. She was unable to estimate how much she slept in a 24 hour period because when she slept, she was not really asleep. Plaintiff slept off and on all day and night. She would get up in the middle of the night, fix something to eat or drink, then lay down and doze off. Plaintiff believed she had a good attention level with regard to activities such as watching TV, reading, or doing chores. Plaintiff stated that her medications caused her heart to beat fast. She also became dizzy at times and needed to sit down. (Tr. 25-26)

Upon questioning by the ALJ, Plaintiff testified that she was diagnosed with narcolepsy in 2000 after a sleep study, but she always knew something was wrong. She stated that she got in trouble in school because she was unable to stay awake. Plaintiff further testified that she had been seeing Dr. Bucelli for 1 ½ years. Prior to Dr. Bucelli, Plaintiff saw Dr. Jones. Plaintiff also saw Dr. LaPote only once. Dr. LaPote asked her a few questions after an appointment with Dr. Bucelli. According to Plaintiff, Dr. LaPote mentioned that she had a bad case of narcolepsy. (Tr. 26-28)

Plaintiff acknowledged that she previously had a cocaine problem; however, she had not used cocaine in 4 years. She had a previous conviction for cocaine possession. Plaintiff's longest job was at McDonald's for about 8 months. Plaintiff was fired from a healthcare job because she fell asleep and ran into a wall. Human Resources felt that she was a risk to patients in that she could drop a tray on a patient if she fell asleep. (Tr. 28-29)

In a Missouri Supplemental Questionnaire, Plaintiff reported that she was unable to work

3

because she could not stay awake and had no control over falling asleep. She lived at home with her mother and 2 daughters. She was able to care for her children, as well as perform activities such as doing laundry and dishes; making the beds; ironing; vacuuming and sweeping; taking out trash; performing home repairs; raking leaves; gardening; banking; and going to the post office. Plaintiff shopped once a week with her mother. She was not allowed to cook. Plaintiff also reported that she had no problems going to sleep but that she fell asleep throughout the entire day and night. She did nothing during the day but fall asleep off and on. She could not stay awake during a 30 minute TV show. While she was able to read, Plaintiff could not stay awake. She did not drive because her doctor advised her not to. She only went out when her mother drove. Plaintiff did not take the bus because she would fall asleep and miss her stop. Plaintiff did not have difficulty with written or verbal instructions, nor did she need reminders to complete chores. She did not have trouble getting along with others. She described her narcolepsy as depressing. (Tr. 122-28)

### III. Medical Evidence

On July 11, 2001, Plaintiff underwent an all-night polysomnography at the Washington University Sleep Disorders Laboratory. Dr. Stephen P. Duntley interpreted the polysomnogram as abnormal due to sleep architecture abnormalities and mild periodic limb movement disorder. Significant sleep disordered breathing was not present. (Tr. 189)

Medical records from Murphy O'Fallon Health Center dated January 5, 2008 noted diagnoses of uncontrolled hypertension; substance abuse; chronic hepatitis C; and narcolepsy[1]. Plaintiff indicated a cocaine addiction for 16 years and that she last used in May of 2007. Plaintiff was

---

[1] Narcolepsy is "[a] sleep disorder that usually appears in young adulthood, consisting of recurring episodes of sleep during the day and often disrupted nocturnal sleep . . . ." Stedman's Medical Dictionary 1281 (28th ed. 2006).

4

prescribed medication. (Tr. 152-53) On February 4, 2008, Plaintiff called the Health Center to report that she was vomiting blood. Plaintiff indicated that she would go to the ER. (Tr. 154)

On March 26, 2008, Dr. Inna Park examined Plaintiff for complaints of narcolepsy, which Plaintiff stated was diagnosed in 1999. Plaintiff reported that she fell asleep 7 to 8 times a day and that she was unable to hold a job. She had not experienced any injuries as a result of her condition. The review of systems was negative. Plaintiff denied alcohol or drug use but acknowledged smoking less than ½ pack of cigarettes a day for the past 2 years. Plaintiff was not in distress, and she did not have any narcoleptic episodes during the exam. She was able to get on and off the examination table without difficulty, and her gait and station were normal. In addition, Plaintiff could heel/toe walk and squat, and she moved easily around the room. Dr. Park noted no muscle atrophy. Plaintiff's range of motion was normal with no joint swelling, warmth, or tenderness. The neurological exam was also normal. Dr. Park assessed narcolepsy, as diagnosed at Washington University in 1999 with ongoing symptoms. (Tr. 156-60)

On March 28, 2008, a medical consultant completed a Physical Residual Functional Capacity Assessment on behalf of Disability Determinations. Maria Wilson noted that Plaintiff should never climb ladders, ropes, or scaffolds, and she should avoid all exposure to hazards such as machinery and heights. However, Ms. Wilson opined that Plaintiff had no other exertional, postural, manipulative, visual, communicative, or environmental limitations. (Tr. 33-37)

A medication log from Saint Louis Connect Care indicated that prescriptions for Ritalin, HCTZ, Atenol, and Clonidine were refilled on July 18, 2008. (Tr. 166) On that same day, Plaintiff had an appointment with Dr. Lapote in the neurology department. (Tr. 192) Plaintiff also saw Dr. Bucelli, who noted that he was applying for a trial of Provigil. Treatment notes also indicate that Dr.

Eli R. Shute was attempting to obtain modafinil for Plaintiff's narcolepsy diagnosis. (Tr. 171-77)

Plaintiff returned to the Neurology department at Saint Louis Connect Care on August 1, 2008. Treatment notes indicated that Plaintiff had been taking Provigil because she was intolerant of Ritalin. Plaintiff reported no improvement in her baseline sleepiness symptoms, despite medication. Dr. Bucelli diagnosed narcolepsy without cataplexy and planned to give Plaintiff a trial of Dexedine. (Tr. 168-69)

Dr. Glenn Lapote completed a Sleep Disorders Residual Functional Capacity Questionnaire on April 6, 2009. He noted that he treated Plaintiff for narcolepsy from July 18, 2008 to present. Plaintiff's symptoms included sleep paralysis, sleep attacks, and excessive daytime sleepiness on a daily basis. Plaintiff did not exhibit signs prior to a spell, and certain situations did not trigger the spells. Dr. Lapote reported that Plaintiff was not a malingerer. Abuse of drugs or alcohol did not contribute to Plaintiff's symptoms, nor did emotional factors contribute to the severity of Plaintiff's limitations. Her impairments were reasonably consistent with her symptoms and limitations. Further Dr. Lapote noted that Ritalin was ineffective, and Dexedrine helped slightly. Plaintiff was not taking medications as prescribed. Her prognosis included continued symptoms. Additionally, Plaintiff's impairments lasted 12 months. Dr. Lapote recommended that Plaintiff avoid work involving climbing and heights; avoid power machines, moving machinery, or other hazardous conditions; limit or avoid operation of motor vehicles; avoid work which is not closely supervised; and take breaks at unpredictable intervals during the workday due to spells, adverse effects of medication, etc. Dr. Lapote further opined that Plaintiff could lift 10 pounds occasionally and should avoid work involving mainly standing and walking throughout the workday. Plaintiff also had severe limitations in maintaining attention for two hour segments and performing at a consistent pace. Her impairments

were likely to produce good and bad days, requiring her to be absent from work more than four times a month. (Tr. 194-98)

### IV. The ALJ's Determination

In a decision dated June 16, 2009, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 2, 2006, her alleged onset date. Although she had temporary and seasonal jobs in 2007 and as recently as December 31, 2008, none of these jobs constituted substantial gainful activity. The medical evidence demonstrated that Plaintiff had narcolepsy and hypertension controlled by medication, but no impairment or combination of impairments met or medically equaled any impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 13)

The ALJ further determined that Plaintiff's allegation of impairments producing symptoms and limitations of such severity that would preclude the performance of any work activity was not credible. The ALJ discussed Plaintiff's testimony and the medical records, noting the sparse number of doctor visits. In addition, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform the physical exertional and nonexertional requirements of work except for climbing ropes, ladders, or scaffolds; working at unprotected heights or around dangerous moving machinery; or driving automotive equipment. The ALJ noted that there were no credible, medically-established exertional or other nonexertional limitations. (Tr. 13-14)

The ALJ determined that Plaintiff had no past relevant work. Her RFC for unlimited exertional work was reduced only by the limitations listed above. She was 38 years old, which was a younger individual. She had a tenth grade education but was literate and able to communicate in English. Plaintiff had no acquired or usable skills transferable to the skilled or semi-skilled functions

7

of other work. Based on her RFC for unlimited exertional work, along with her age and education, the ALJ relied on the Medical Vocational Guidelines to find Plaintiff was not disabled. The ALJ noted that nonexertional limitations did not significantly compromise Plaintiff's RFC. Further, the ALJ found that Plaintiff did not have an uncontrollable substance abuse disorder that would prevent the performance of substantial gainful employment. Thus, the ALJ concluded that Plaintiff was not under a disability at any time through the date of the decision. (Tr. 14)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that she is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th

Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's

complaints under the Polaski[2] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

## VI. Discussion

In her Brief in Support of the Complaint, the Plaintiff asserts two arguments. First, Plaintiff asserts that the ALJ's RFC determination is not supported by medical evidence. Second, Plaintiff contends that substantial evidence does not support the ALJ's decision because Plaintiff has a nonexertional impairment requiring Vocational Expert ("VE") testimony. Defendant maintains that the ALJ properly evaluated Plaintiff's subjective claims and found them to be not credible; the ALJ properly assessed the medical evidence; substantial evidence supports the ALJ's RFC determination; and substantial evidence supports the ALJ's reliance on the Grids to conclude that Plaintiff was not disabled.

The undersigned agrees with the Plaintiff's argument that the ALJ's determination is not supported by substantial evidence because the ALJ failed to utilize a VE in light of Plaintiff's nonexertional impairment. The ALJ found that Plaintiff had severe impairments, including narcolepsy and hypertension controlled by medication. (Tr. 13) In reaching the decision that Plaintiff could perform unlimited exertional work, the ALJ relied on the Grids instead of consulting a VE.

---

[2]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

Specifically, the ALJ found that Plaintiff's capacity for the full range of exertional work was not significantly compromised by the nonexertional limitations of not climbing ropes, ladders, or scaffolds; not working at unprotected heights or around dangerous moving machinery; or driving automotive equipment as part of job duties. Thus, the ALJ relied on the Grids to find Plaintiff not disabled. (Tr. 14)

An ALJ may rely on the Grids to find a plaintiff not disabled where the plaintiff does not have nonexertional impairments or where the nonexertional impairment does not diminish the plaintiff's RFC to perform the full range of activities listed in the Grids. Muncy v. Apfel, 247 F.3d 728, 735 (8th Cir. 2001) (citing Holz v. Apfel, 191 F.3d 945, 947 (8th Cir. 1999)). "However, when a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Grids and must instead present testimony from a vocational expert to support a determination of no disability." Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999). "Nonexertional limitations 'affect an individual's ability to meet the nonstrength demands of jobs,' Social Security Ruling 96-4p, 1996 WL 37418, *1 (1996), 'that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling[.]'" Sykes v. Astrue, No. 4:06cv1732 TCM, 2008 WL 619216, at *19 (E.D. Mo. March 3, 2008) (quoting 20 C.F.R. § 404.1569a(a)). Nonexertional limitations include difficulty maintaining attention or concentration. See 20 C.F.R. § 404.1569a(c).

Here, the ALJ determined that Plaintiff's nonexertional impairment related to her narcolepsy did not significantly erode her RFC for the full range of exertional work. Although the ALJ did mention some limitations to the full range of work, he found that these restrictions did not preclude Plaintiff from performing a significant number of jobs in the national economy. (Tr. 13) While the

undersigned agrees that Plaintiff should stay away from ladders, heights, and dangerous machinery, as well as refrain from driving, the ALJ ignored testimony that during one attempt at work, Plaintiff ran into a wall when she fell asleep while walking. (Tr. 29) Indeed, Plaintiff testified that she fell asleep randomly throughout the day, usually without any warning. (Tr. 20-21) This affects the non-strength requirements of job performance, and certainly impacts Plaintiff's ability to pay attention and concentrate during the day.

In similar cases in this district, the ALJ employed a VE to testify regarding the plaintiff's ability to work despite narcolepsy. See, e.g., Wilson v. Astrue, No. 4:10CV01759 AGF, 2011 WL 4635142, at *5 (E.D. Mo. Sept. 30, 2011) (acknowledging VE testimony regarding jobs Plaintiff could perform in light of nonexertional restrictions with no exertional limitations); McNeil v. Astrue, No. 4:10CV2035 DDN, 2011 WL 2621705, at *4 (E.D. Mo. July 5, 2011) (noting that the ALJ posed 3 hypothetical questions to the VE including limitations from nonexertional impairments due to narcolepsy). Likewise, in the Western District of Missouri, the court remanded a case involving a plaintiff diagnosed with a sleep disorder/narcolepsy/breathing difficulties. In Bonds v. Astrue, the court noted the ALJ's alternative holding that Plaintiff could work even if he was unable to drive due to narcolepsy was insufficient because the inability to drive stemmed from a nonexertional impairment. No. 10-0603-CV-W-ODS, 2011 WL 381858, at *2 (W.D. Mo. Feb. 3, 2011). The court found, "[a]bsent testimony from a vocational expert, there is no basis for concluding Plaintiff is capable of working in spite of his nonexertional impairment." Id.

While Plaintiff's narcolepsy may not preclude her from performing all work, her nonexertional impairment is significant enough to warrant VE testimony. Although an ALJ may rely on the Grids where nonexertional impairments do not significantly diminish a plaintiff's RFC to perform the full

range of activities, "'persistent nonexertional impairments which prevent the claimant from engaging in the full range of activities listed in the Guidelines will preclude the use of the Guidelines to direct a conclusion of disabled or not disabled.'" Sieveking v. Astrue, No. 4:07CV986 DDN, 2008 WL 4151674, at *6 (E.D. Mo. Sept. 2, 2008) (quoting Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997)). The ALJ's reliance on the Grids contradicts not only the RFC finding, which specifically includes climbing, driving, and environmental limitations, but also the initial finding that Plaintiff's narcolepsy is "severe." See Sieveking, 2008 WL 4151674, at *7 (remanding case for VE testimony where ALJ included plaintiff's avoidance of complex work in the RFC).

Because the record demonstrates that Plaintiff's nonexertional impairment significantly impacts her ability to perform the full range of exertional work, the ALJ was required to consult a VE regarding the effects those limitations have on Plaintiff's RFC. See Beckley v. Apfel, 152 F.3d 1056, 1060 (8th Cir. 1998). Therefore, the undersigned finds that the ALJ erred in erroneously applying the Grids and in failing to elicit testimony from a VE regarding Plaintiff's ability to perform work existing in significant numbers in the national economy, despite Plaintiff's severe nonexertional impairment of narcolepsy. As a result, substantial evidence does not support the ALJ's conclusion that Plaintiff was not disabled. Lucy v. Chater, 113 F.3d 905, 909 (8th Cir. 1997). Therefore, the Commissioner's decision should be reversed and remanded to the ALJ to adduce testimony from a VE regarding Plaintiff's nonexertional impairments and their impact on her ability to perform jobs in the national economy. See Yeley v. Astrue, No. 1:07CV148 LMB, 2009 WL 736701, at *13 (E.D. Mo. March 18, 2009). The undersigned also notes that the ALJ gave little weight to Dr. Lapote's questionnaire, stating that Plaintiff saw another neurologist, Dr. Bucelli at St. Louis ConnectCare and that Dr. Lapote only examined Plaintiff once. (Tr. 12) On remand, the ALJ may want to contact Dr.

Bucelli for completion of a Sleep Disorder Residual Functional Capacity Questionnaire from Plaintiff's treating neurologist.

Accordingly,

**IT IS HEREBY ORDERED** that this cause be **REVERSED** and **REMANDED** to the Commissioner for further proceedings consistent with the above.

/s/ Terry I. Adelman<br>UNITED STATES MAGISTRATE JUDGE

Dated this  22nd  day of March, 2012.